The second case before us today is Greer v. Dowling, 18-6067. May it please the Court, my name is Brett Lilly and I am humbled and honored to be here today, and I wish to thank the Court for the appointment to represent Mr. Greer in this appeal. This case touches on the fundamental relationships not only between the individual and the divine, but between the individual and the state. As between the individual and religion, our jurisprudence Mr. Lilly, do you mind, I think maybe if you back up just a tad. Is that better? Yes, absolutely. Oh, pardon me. I have a recording studio. I should know how to use a microphone, and apparently I don't. As between the individual and religion, our jurisprudence holds that an individual's exercise of their religion is free, and this means that it is a matter of Mr. Greer's subjective, sincerely held religious belief in his kosher diet. It's important in this case that this is not disputed, so this threshold question has been met. As between the citizen and the state, first, the facial determination by the prison chaplain as to what is or is not kosher is in and of itself a substantial burden on Mr. Greer's religious exercise of his kosher diet. Mr. Lilly, can I ask you, because there's two separate iterations of what the chaplain said. One is that the crackers and the iced tea are not kosher, and then the second iteration is that those were not within the prepackaged kosher meals that were supplied to inmates that opted for the kosher diet. Which iteration is correct? I don't think either of them are correct. It's correct in the sense that he did eat crackers. And I don't mean which is legally viable or legally permissible, but which was the rationale? It seemed to me it changed. If you look at the record carefully, I think Chaplain Drawbridge initially said that he consumed a non-prepackaged kosher meal. And what Mr. Greer said was that, no, he was actually preparing a meal for somebody who was speaking at the veteran's banquet, so that what the chaplain observed in terms of him preparing that plate was for another individual. So that was what the chaplain first said was that he observed him preparing that separate plate. And then at some point, I'm not sure where, but when Mr. Greer said that he only consumed crackers and iced tea, that became the second rationale, if you will, for claiming that he violated the terms of the religious diet agreement. Because Mr. Greer put forward the crackers and iced tea as this is what I ate, because he was watching the video or the tape. He didn't see, Drawbridge didn't actually see what he put in his mouth, right? That's my understanding, Your Honor. And so Greer says, I had crackers and iced tea, but that's my view, that's kosher, and so that's where you end up with this business about Drawbridge trying to define what kosher is, right? Correct. And while we're quickly on that point, Your Honor, the crackers had the U in a circle symbol indicating that they were kosher. And second of all, there's no indication anywhere that iced tea is not kosher. My understanding is at a minimum iced tea is considered parv, which means that it's neutral. It's not a violation of kosher. You know, for every 100 individuals that subscribe to a kosher diet, there are probably 100 different definitions of what is kosher. So not everybody that observes a kosher diet observes the protocol that if it has a U that it's kosher. Some do, some don't. That is correct, Your Honor, but it is also my understanding that if it has the U symbol from the Orthodox Union, that that is considered kosher. And ultimately, though, I think, well, what I take as sort of extrapolating from Judge Baccarat's point is, I mean, ultimately does it really matter? I mean, Abdul Hasib suggests that, you know, our Tenth Circuit case suggests that your subjective view of what you need and fulfillment of your religious belief is how you begin to start that discussion. In other words, you know, if Drawbridge said, okay, well, I'll take everything that has a U on it, and then Greer said, well, you know, as I sincerely hold my belief, it doesn't have to have a U, then who's going to make that determination? I would make two points about that, Your Honor. The first would be that if this Court, in its wisdom, holds that the determination by the chaplain in the first instance of what is or is not kosher is in and of itself a violation of both the free exercise clause and RLUIPA, then we get rid of that question. In other words, if a chaplain is not deciding what violates the religious diet, then that issue is removed. And also the secondary issue of if it's a wrongful determination, do we need due process, that question is removed. If the Court determines that it's appropriate for the chaplain to make that determination of what is or is not kosher, then we get to the question of due process. And it seems to me what you're asking, Your Honor, would come up in that instance. And that would be Mr. Greer's opportunity at that point to tell the chaplain, look, if the crackers had a U with the circle symbol, that means it's kosher, and so therefore you can't consider that a violation. And what clearly established law do you have that suggests that Mr. Greer would be entitled to due process in this context? I believe that if you look at, first of all, the law is clearly established in this circuit. I think if you start with Bern Beerheide and Abdul Habsid, that if there is a substantial burden, if there is a sincerely held religious belief in the kosher diet in the first instance, that there's at least a presumption, I think, under Abdul Habsid, that even a temporary suspension of that diet can be considered a substantial burden. There wasn't a temporary suspension. And Abdul Habsid, as far as I recall, he didn't get it, period. That is true. Which makes that case different than this case. One could argue that, you know, if you're looking at clearly established law, you're looking at law that would have given fair warning. A complete ban and a 120-day suspension are two different things. Fair enough, Your Honor. But I believe the second aspect of the Abdul Habsid opinion talked about that even the court couldn't decide it. It just simply said that as a matter of this could be a substantial burden, it couldn't be decided on summary judgment. But there is a suggestion that as to the matters not put on his, the jello and matters not put on his plate, that the more that were haram, if I'm pronouncing that correctly. Haram. Haram? Haram, I think, yeah. For Mr. Abdul Habsid, the court said there can be a presumption that the longer that goes on, the more of a substantial burden that becomes. And you used the word suggestion. And I started this colloquy with the question clearly established law. Suggestion does not equal clearly established law, does it? I think that would be a fair statement, Your Honor. Okay. And Abdul Habsid did not talk anything about liberty interests, did it? It does not. Okay. And so where does this clearly established law come from? It's certainly not going to come from Abdul Habsid if it doesn't say anything about a liberty interest, right, for a due process claim. Well, to take that point first, Your Honor. Please. If there is a clearly established right under the First Amendment, then I think that by definition means it's a liberty interest. I appreciate you thinking that. But where is the case that says that? And if you look at Reeves, Reeves isn't going to help you, right? No, I don't think it does, Your Honor. Okay. For one thing, it was a not published opinion. Correct. And for another, it simply said, in that case, that the district court didn't evaluate the procedural due process claim and sent it back to the district court as I understood it. Could I ask you about the second report and recommendation? There seems to me to be a viable question here of fair firm waiver, and I want to understand why there isn't a serious firm waiver problem as it relates to that. Your client had four opportunities to object to that report and recommendation. Even the last motion to object was filed late, and then he didn't object at all. And so where out of that do you get any sort of interest in justice for us to not find that he has waived any claim relative to the second report and recommendation? My first answer to that would be that he did object to 113, and so I think that matter is before the court. And real briefly, I think that's the RLUIPA claim. And so at a minimum, I think this court can find that the RLUIPA claim is before it and rule on it. Can I ask you about that? Because you argued that in your brief, and I wasn't sure I followed it. For the claims that were addressed in Magistrate Judge Goodwin's second report and recommendation, obviously those were claims that survived document 113. And so there was an objection to 113, but the second R&R pertained only to those claims in which your client prevailed after 113. So why would the objection to 113 preserve an objection to a subsequent R&R? I guess I would like to distinguish to saying I believe the objection to 113 is properly before this court because it was not waived. Okay. So quite apart from whether we were to find that there was a firm waiver that should be applied as to the second R&R. Correct. You still have a viable challenge as it relates to the first R&R, which involved exhaustion issues in part, right? Yes. Okay. So to answer your question about 173, I think it would be fair for this court to say that the firm waiver rule applies, but I also think it would be fair for this court to say that this is a case where the interests of justice require review. Why? I think, first of all, it's a matter of free exercise, which is a matter of critical public importance. And although Mr. Greer did not object, I think his reasons were compelling for the reason that he couldn't, which were that he was being transferred from prison to prison. Along the way, he was not getting his legal materials. And I think if the court takes a fair look at the record, it's pretty clear when Mr. Greer had the opportunity to get to a computer and to type that for a pro se litigant in prison, he did a pretty good job. Well, but a pro se litigant doesn't have to type documents. And, in fact, he was able to submit, I think, five requests for an extension of time. So in lieu of those five requests for an extension of time, why wasn't he able to at least hand write an objection to the report and recommendation? I can't answer that because I'm not Mr. Greer, Your Honor. All I can say is that I believe his feeling was that the amount of case law that he needed to recite was complex enough that he didn't feel comfortable without having those materials to reference. And he did more than that, didn't he? He filed a judicial notice two days before the deadline. He also filed objections, other objections to R&Rs that were pending. I mean, the record shows him doing a lot of stuff during that period of time in which he was seeking the four extensions. And citing case law in doing those things, too, right? I do believe he was objecting, Your Honor. I'm not so certain that he was actually citing case law. Well, I think in one instance, perhaps. But, okay, I'll go back and check. Maybe I'm wrong. But even if you're correct, and I'm not disputing that you are not, I guess the difference between citing case law and what law is clearly established, look, I've been doing this a long time, and it's hard for me to keep some of these cases straight. So I think it was simply a matter of Mr. Greer wanting to be accurate with the court in terms of what he was citing to in the case law. So that's number one. And that's different from simply responding off the top of his head, so to speak, in terms of the other issues that were going on. So I guess the distinction I would make between responding to normal matters in the litigation is different from responding to the complex legal analysis that qualified immunity requires. But to that point, I would just like to briefly make my point about 113. So at a minimum, I think there's no dispute he objected to that. And since he appealed the final judgment that the ruling in docket 113 is before the court, and because Mr. Greer specifically objected to the RLUIPA claim there, which the district court dismissed, I think even if the court doesn't reach the qualified immunity questions because they feel that it was a matter of firm waiver and the interests of justice do not require review, that the RLUIPA claim for the religious police, so the claim on its face, and also the RLUIPA claim for the due process on the back end, are both properly before this court. And that the district court improperly read the exhaustion of the second claim, 67, was the grievance. They read that too broadly to knock out too much of count one. And because there's little question that count one was properly exhausted under grievance number 55 and 55A. And the composition of that being what? What kind of RLUIPA claim? The RLUIPA claim to challenge what Mr. Greer calls the religious police. So that's the decision of the chaplain to determine what is or isn't kosher on its face. And second of all, the determination that was wrongful, which requires due process. And so you're saying a facial challenge as it relates to appendix C, attachment C. I say a facial challenge as it relates to the ability of the prison chaplain to determine what is or is not kosher in the first place. All right. Thank you, counsel. Thank you, your honors. Good morning. May it please the court. My name is Lexi Norwood, and I represent the individual defendants or appellees in this case. And those include Chaplain Drawbridge, who has since passed away after this case was filed. Janet Dowling was the warden at the facility. Kelly Curry was the food services manager. Felicia Harris was the law librarian. Kathy Milbers was the case manager. Mike Rogers was the housing unit manager and investigator. Dan Grogan was the unit manager and discipline hearing officer. And Mark Knutson was the ARA. So those are the defendants, appellees in this case. I'd like to start by saying that even if Mr. Greer did exhaust his free exercise claim, which he didn't, there are some issues there. And first and foremost, the defendants would be entitled to qualified immunity. Why? Because in Document 63, in your motion to dismiss her in the alternative for motion for summary judgment, you did argue qualified immunity on the free exercise that were loop-a-claim. And then you expressly withdrew that motion. And then your summary judgment motion with regard to the – that gave rise to the second reporting recommendation has no reference to qualified immunity or the violation of clearly established law. So how can we affirm an alternative ground, the absence or the absence on grounds of qualified immunity, if you didn't argue for summary judgment on qualified immunity? It's our position that Mr. Greer did not exhaust those claims. And so we did not continue to argue on those claims because we agreed with the court that he did fail to exhaust. So if we agree with Magistrate Judge Goodwin and the District Judge Miles O'Grange on exhaustion, of course we can affirm. But if we disagree, are you conceding that we cannot affirm an alternative grounds based on qualified immunity with regard to the second R&R by virtue of the fact that you didn't argue for summary judgment based on qualified immunity with regard to the loop-a and free exercise claim? We would not concede to that, Your Honor. If it is overturned and sent back to the Western District, we would bring up the argument there. Well, you can – yeah, I mean, if the District Judge lets you do something, I mean, we're not going to be there to stop you. But my question is what we can do or cannot do. And my question is are you conceding that we cannot affirm an alternative ground based on qualified immunity in light of the fact that you haven't argued for qualified immunity in district court? I believe we would have to concede that and then take it back to the Western District at that point, Your Honor. Well, wait a minute. Remind me, is there only – you filed a motion for summary judgment. Is there cross motions for summary judgment here? We did file two motions for summary judgment. And one of them was taken care of in Document 113 and the other one was in 173. And I've been thinking about this in first and second R&R. Okay, so I don't get confused on the numbers here. The first one dealt with the loop-a and First Amendment claim on exhaustion grounds, right? Yes, Your Honor. Okay. Then there's the second R&R. And in the second R&R, you filed motions for summary judgment but did not address the merits of the ones that were dropped out on exhaustion grounds. Yes, Your Honor. Was there a cross motion for summary judgment asking for relief on the loop-a and First Amendment ground? There was not, Your Honor. Okay. And I would also like to say that there are no – there's no cause of action under loop-a for individual claims. And that is a 10th Circuit opinion and steward. So that would also be a ground to dismiss that loop-a claim. As far as the plaintiff saying that there's a – that the chaplain was not able to make these certain decisions that he did make and he did remove the Mr. Greer from the religious diet for 120 days, there was an affidavit signed by Drawbridge that said that he is – he does oversee inmates and he does make the determinations of whether or not they should be removed from those diets based on their failed compliance with Attachment C. Well, he can think – good. Go ahead. He can think he can do that. But, I mean, what does our Abdul Habsib case say? I mean, so whether he thinks he can do that or not, the law doesn't seem to go in his favor, does it? Well, there's nothing that says that he can't, actually. What is the case – I'll pull out the language if you want me to pull out the language. I mean, it's pretty clear in that case that you can't have people making determinations for what is – okay, here we go. Contrary to the defendant's arguments, however, the issue is not whether the lack of a halal diet that includes meat substantially burdens the religious exercise of any Muslim practitioner, but whether it substantially burdens Mr. Abdul Habsib's own exercise of his sincerely held belief, which means that Chaplain Drawbridge can't decide, oh, well, you know, I'm an expert on what's kosher, and because you want to eat kosher, I don't agree with your definition of kosher, so you don't get it. Why is that legal? Well, even if he can't make that decision, it's DOC policy that if inmates do not adhere to Attachment C, which has never been overturned as unconstitutional, that they can be removed from those diets for a short period of time. That leads to a different question. Do you contemplate that in that grievance – I guess it's 155 – is there some facial challenge to Attachment C in that grievance? The Attachment C has been facially – he does attack it facially. The problem is it's never been shown unconstitutional, and to the contrary, in this district and in the Western District of Oklahoma specifically, they have found that for a short period of time, you can take an inmate off of the kosher diet or any – What's a short period of time? That has never been determined by – In my client's opinion, it is a short period of time. If we didn't feed you for 120 days, would you be thinner now than later? I definitely would, but the question is not that. He is still given three meals a day, seven days a week. Well, if he can't eat it, it's a violation of his sincerely held religious beliefs. He's also available to go to the commissary and purchase items that are kosher. I don't think that cuts it. And when you talk about a Western District of Oklahoma case, are you talking about Reed? Reed has – The Reed case that happened to be overturned by a panel of this court on appeals? It was overturned and sent back, and it was found that even 78 days is not enough. It was found that by what? Went on remand it was found that? It was found on remand. Yeah, but we found that you could substantially burden somebody's First Amendment rights by this no zero tolerance policy, didn't we? Yes. Okay. But at this point, the law is not clearly established of what the actual number would be to take away a kosher meal or any other kind of religious meal from an inmate and make that a constitutional violation. And in this case, nobody has actually said 120 days is too much. The court said it might be too much but never made the determination that it is too much. And so the law here is not clearly established in that part that we can take away his religious diet for 30 days or 120 days or maybe even a year until that is actually clearly established by a court. Let me ask you about Document 113 and more specifically what Magistrate Judge Goodwin and ultimately Judge Miles O'Grane said would survive the ruling in Document 113, and that is the scope of 1455. The grievance 1455 with regard to the nature of the complaint says, quote, on March 26, 2014, evening meal, I was removed from my religious kosher diet in direct violation of my constitutional rights. Why, if at all, should that grievance, 1455, not be construed as a grievance that covered his free exercise rights and his reluper rights? The way that the DOC policy works is you can only grieve one issue at a time, and in this case he- That's not my question because Magistrate Judge Goodwin ultimately took those, what you're about to say, the failure to specify one issue in the grievance appeal and said that that was just an incorrect interpretation of DOC policy. And so my question is very specific. Is the scope of this grievance sufficient to cover his relupa and free exercise rights? Not whether there is regard to some internal procedural defect, because you lost that issue in Document 113. Right. I'm asking about the scope of this grievance. The scope of that grievance encompasses the due process issue because he was saying that the meals were taken away from him without due process. Where does it say due process in 1455? I thought it says in violation of my constitutional rights. He does say that, but he does go on to say that it is a due process issue, whereas in the other grievance that has- I'm looking at 1455, and I'm sorry, I just don't see the words due process. It may be overlooking it. And I'm not trying to quiz you. I mean, if you don't remember. No, I- I just don't see that. I read it to bring up his Fourth Amendment rights because he was taking it off, and he didn't get a chance. And what he actually said in there is he wanted to be able to explain to DOC officials why he shouldn't be taken off because of his own personal beliefs. And to me, that's read to be a Fourteenth Amendment issue and not a First Amendment or RLUIPA claim. And in those claims, he actually says that he signed Attachment C under duress and that he should-you know, it is a substantial burden on his right to practice religion, which I do agree with. So they were two separate issues that he tried to grieve, and he knew that the date of his injury was March 26, 2014. Now, do you agree with what? That it's a substantial burden on his practice of religion that he had to sign Attachment C? I believe that the way that he worded his request to staff would say that it is a burden on his right to practice his free religion by having to sign Attachment C. The nature of the complaint, and Judge Bachrach is not the only one who, if there's something there, is missing it. The nature of the complaint says nothing about what you're just saying. It says constitutional rights. You took away my meals in violation of my constitutional rights. Coach your meal. First thing that occurs to me is First Amendment. I don't think that's unreasonable, is it? But he did go on to say, because he didn't get a chance to explain what is right and what is wrong, and that Defendant Drawbridge is the one that made the decision to take him off. And I think Judge Goodwin even did distinguish those as this is one claim, which is going to be under the due process issue, whereas the second request to staff that was out of time had to do more with violating his free exercise of religion. 1467. Yes, 1467. But I think that's true, but I think that's the issue that he's challenging. He's saying that Magistrate Judge Goodwin construed the scope of the claims that were covered in 1455 too narrowly and focused unduly on 1467. And I understand that, but I also see it the way Judge Goodwin does, whereas 1455 included only the due process issue by him not being allowed to explain to DOC officials what he actually believes is kosher, whether that be iced tea and crackers or any other items that he would like to enjoy that are not given to him by DOC who has a list of these items that are kosher compliant. And without them being on that list, DOC has no way of knowing whether iced tea is made kosher or these crackers were made kosher. And so it's not about just drinking iced tea and eating crackers. It's more about DOC having this list and being able to work off this list. And the inmates also have this list. So if they want to eat something that's not kosher and not on the diet, then it is okay for DOC to enforce their policies. Well, suppose it is kosher and they don't give them a chance to explain it. Does that not bother anybody? Well, this food was brought in from an outside source, and so there is no way to determine. Well, you have a supermarket there. People don't have money to go buy stuff like that, do they? The inmates? Yeah. Some of them do. It's what? Some of them do have the money to go out and buy those things. But the thing is, he didn't ask if the tea was kosher. He didn't ask if the crackers were kosher. Well, he knew it was. It had a U on it. That's according to him. But you haven't disputed that. He produced the document that showed that it had a U on it. Well, we don't dispute the crackers, but the iced tea, we have no idea how that's made. And tea cannot be kosher if it's made in a certain way. And anybody on a kosher diet knows that the food has to be prepared a certain way for it to be kosher. I didn't know that about iced tea. I mean, I really didn't. You're saying iced tea can be non-kosher? Iced tea can be non-kosher depending on how it is prepared and where it is prepared. You know, if it's prepared with other foods, it may not be kosher. If it's prepared and has other things in it, like the iced tea bags, may not be kosher, or the tea may have milk in it that's not kosher as well. So we have no way of knowing whether this tea is kosher or not. Well, how did Mr. Drawbridge, looking at a video, figure all that out? Mr. Drawbridge saw in the video that not only— He couldn't see much on the video about how iced tea was made. There's nothing about how the iced tea was made, just that it was brought in by an outside vendor and not by DOC, and therefore not on DOC's list of kosher items. Thank you, Counsel. Your time is up. Case is admitted.